IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW HEISEY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  20-324 |
| Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                   November 23, 2020

Matthew Heisey ("Plaintiff") seeks review of the Commissioner's decision

denying his applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI").  For the reasons that follow, I conclude that the Commissioner's

decision denying benefits is supported by substantial evidence and will affirm.

**I.      PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB and SSI on October 21, 2017, tr. at 106-07,

188-94, alleging that his disability began on May 26, 2017, as a result of a degenerative

disc disorder, spinal stenosis, arthritis in the back, two ruptured discs, asthma, anxiety,

and depression.  Id. at 94-95.[2]  Plaintiff's applications for benefits were denied initially,

id. at 110-14, 115-19, and Plaintiff requested a hearing before an ALJ, id. at 124-25,

---

[1] When this action was filed, Plaintiff named Nancy Berryhill, the Acting
Commissioner of Social Security as the defendant.  Doc. 1 at 4 (ECF pagination).
Andrew Saul became the Commissioner of Social Security ("Commissioner") on June 17,
2019, and should be substituted as the defendant in this action.  See Fed. R. Civ. P. 25(d).

[2] Plaintiff's prior application for benefits, alleging an onset date of July 24, 2014,
was denied by an Administrative Law Judge ("ALJ") on July 1, 2017.  Doc. 12 at 12;
Doc. 15 at 6.  As will be discussed, there is an issue regarding the effect this earlier
decision has on the relevant period under consideration with respect to his current claim.

which took place on July 17, 2019.  Id. at 34-56.  On August 9, 2019, the ALJ found that

Plaintiff was not disabled.  Id. at 14-26.  The Appeals Council denied Plaintiff's request

for review on November 5, 2019, id. at 1-3, making the ALJ's August 9, 2019 decision

the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action in federal court on January 2, 2020, Doc. 2, and

the matter is now fully briefed and ripe for review.  Docs. 12 & 15.[3]

## II.   <u>LEGAL STANDARD</u>

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.     Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.     If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

---

[3]Defendant consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  <u>See</u> Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018).  Plaintiff is deemed to have consented based on his failure to file the consent/declination form and the notices advising him of the effect of not filing the form.  Docs. 3, 7, 9.

4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

III.   **DISCUSSION**

A.   **ALJ's Findings and Plaintiff's Claims**

The ALJ found that Plaintiff suffered from two severe impairments -- disorders of the spine and asthma -- specifically finding that Plaintiff's depression and obesity were not severe.  Tr. at 16-18.  The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 18-19, and that Plaintiff retained the RFC to perform sedentary work with the following limitations; no ladders, ropes or scaffolds; no exposure to unprotected heights; occasional climbing of ramps and stairs; moderate exposure to extreme heat, cold, dust, odors, wetness, gases and fumes; can perform only unskilled work; needs to alternate from standing to sitting every thirty - to- sixty minutes with ten-minute change of positions; and occasional overhead reaching and lifting.  Id. at 19.  The ALJ then found that Plaintiff could not perform his past relevant work as a truck driver or painter.  Id. at 24.  Finally, based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform work as a lens inserter, order clerk in the food and beverage industry, or stuffer, and was, therefore, not disabled.  Id. at 25.

Plaintiff claims that the ALJ erred in failing to (1) properly determine Plaintiff's alleged onset date resulting in her failure to fully consider the relevant evidence, (2) consider source statements and adequately explain those that she considered, (3) consider the effects of Plaintiff's medications in determining Plaintiff's RFC, (4) account for Plaintiff's problems in concentration, persistence and pace in determining Plaintiff's RFC and (5) adequately consider Plaintiff's subjective complaints.  Doc. 12 at

12-23.  Defendant responds that the ALJ correctly did not reopen Plaintiff's prior claim, supporting the later onset date, and properly considered the remainder of the evidence, resulting in a decision that was supported by substantial evidence.  Doc. 15 at 4-19.

###   B.   <u>Plaintiff's Claimed Limitations</u>

Plaintiff was born on October 11, 1973, making him 44 years old at the time of his application and 45 years old at the time of the ALJ's decision.  <u>Tr.</u> at 188.  He completed the twelfth grade and has worked as a truck driver and electrostatic painter.  <u>Id.</u> at 37-38, 49, 222.

Plaintiff has a history of back pain and suffered a work injury on June 24, 2014. <u>Tr.</u> at 317, 361, 430, 466.  At the administrative hearing, Plaintiff's counsel characterized Plaintiff's primary issue as back pain that radiates into his lower extremities.  <u>Id.</u> at 36. Plaintiff testified that before his November 2016 surgery (detailed below), "the majority of the pain was in the left leg," however, after the surgery, he had pain in the right leg, which subsided about a year after the surgery.  <u>Id.</u> at 43.  The pain in the left leg has remained constant.  <u>Id.</u>

Plaintiff described having good days and bad days with two bad days a week or possibly six a month.  <u>Tr.</u> at 39.  On good days, Plaintiff can help around the house by doing laundry and loading the dishwasher.  <u>Id.</u> at 38-39.  On bad days, Plaintiff needs help putting his socks on and getting out of bed or off the couch and is unable to shower on his own.  <u>Id.</u> at 38-39, 45.  On good days, Plaintiff can drive a car, but does not attempt to do so when he has a bad day.  <u>Id.</u>   On bad days, Plaintiff spends most of the day lying down.  <u>Id.</u> at 43.  On a good day, Plaintiff estimated that he could sit for half an

hour before needing to get up, and walk for ten to fifteen minutes before needing to sit down.  Id.  Plaintiff testified that his symptoms are exacerbated when he does anything for an extended period of time.  Id. at 46.

Plaintiff testified that he usually sleeps only a couple hours at night and then a couple hours during the day, and that his pain medication causes drowsiness.  Tr. at 44-45.  In addition to pain medication, Plaintiff uses a TENS unit and heating pad for pain.  Id. at 45.  The pain also interferes with his ability to concentrate.  Id. at 46.

Plaintiff also suffers from asthma and uses two different inhalers daily.  Tr. at 47.  He has shortness of breath when he climbs stairs.  Id.

### C.   <u>Summary of Medical Record</u>[4]

As previously noted, Plaintiff has a history of back pain.  In a consultative examination performed by Russell Amundson, M.D., on September 16, 2015, the doctor noted diagnoses of spinal stenosis[5] and arthritis in the lumbar region, and also noted Plaintiff's reports of sciatic pain in the left leg to the foot, with occasional discomfort in the right leg.  Tr. at 361.  According to Plaintiff's report at the time, the pain was

---

[4]As will be discussed later in this Report, see infra at 14-19, Plaintiff claims that the ALJ's decision in his current claim amounted to a de facto reopening of his earlier claim and that the relevant period under review begins on June 24, 2014.  In this summary, I include a review of the evidence in the administrative record.  To the extent my review includes evidence relevant to the ALJ's prior determination, I do so for completeness and to provide a medical history of Plaintiff's impairments.

[5]"Spinal stenosis is a narrowing of the spaces within your spine, which can put pressure on the nerves that travel through the spine."  See https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Oct. 23, 2020).

"tolerable" until a work-related injury on June 24, 2014, and his symptoms were no longer tolerable.  Id.  In terms of radiological studies, an August 25, 2014 MRI showed "[m]ild acquired central spinal stenosis, stable" at L4-5, and "[p]osterior central disc protrusion," demonstrating mild retraction compared with a prior MRI taken on January 7, 2012, "with reduction of impingement on the proximal left L5 nerve root."  Id. at 312; see also id. at 309 ("The herniated nucleus pulposus at L5-S1 seen on the 2011 film appears to have retracted and is less prominent.").[6]  On November 3, 2014, after examining Plaintiff and the 2014 MRI, Craig Johnson, M.D., at Reading Health, diagnosed Plaintiff with bilateral "left much greater than right" lumbosacral radiculopathy, central disc protrusion L4-5, central and left disc protrusion L5-S1, and lumbar degenerative disc disease and degenerative facet joint disease at L4-5 and L5-S1. Id. at 377-78.  Plaintiff underwent an epidural steroid injection later that month with no benefit.  Id. at 305, 310.

Throughout this period, Plaintiff's primary care physician was Bertrand High, M.D., who prescribed Norco and, at various times cyclobenzaprine and ibuprofen, for Plaintiff's back pain.[7]  Tr. at 463-537.

---

[6]The 2011 MRI was done on April 18, 2011, and showed a "large L5-S1 posterior herniated disc resulting in severe central canal stenosis," and "moderate L4-5 posterior herniated disc with central canal narrowing."  Tr. at 386-87; see also id. at 391-92 (MRI report).

[7]Norco (other brand name Vicodin) contains a combination of hydrocodone, an opioid pain medication, and acetaminophen, a less potent pain reliever that increases the effects of hydrocodone.  See https://www.drugs.com/norco.html (last visited Oct. 23, 2020).  The record also contains references to prescriptions for Percocet, see e.g., tr. at 640, which contains the same combination of hydrocodone and acetaminophen.  See https://www.drugs.com/percocet.html (last visited Oct. 23, 2020).  Cyclobenzaprine

Plaintiff participated in physical therapy in July and early August 2016.  Tr. at 576-99.  On August 23, 2016, Plaintiff underwent an MRI which showed significant stenosis at L4-5, severe right-sided neural foraminal narrowing, and left-sided neural foraminal narrowing.  Id. at 422, 431, 813.  Richard Close, M.D., a neurosurgeon with the St. Joseph Medical Group, read the MRI to reveal "a new finding of a small lesion in the foramen at L5-S1 on the left side" and believed Plaintiff's pain radiating into his lower left calf and foot was caused by the lesion.  Id. at 402.  On November 30, 2016, neurosurgeon Kenneth Hill, M.D., performed an L4-5 laminotomy with foraminotomies bilaterally.  Id. at 427.[8]  Ten days after surgery, Plaintiff reported his left leg pain was 60% improved.  Id. at 448.  However, Dr. Hill noted that Plaintiff had returned because he had run out of narcotics, having used them due to increased pain the first four days

---

(brand name Flexeril) is a muscle relaxant.  See https://www.drugs.com/cyclobenzaprine.html (last visited Oct. 23, 2020).

[8]"Laminectomy is surgery that creates space by removing the lamina - the back part of a vertebra that covers your spinal canal. Also known as decompression surgery, laminectomy enlarges your spinal canal to relieve pressure on the spinal cord or nerves." See https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533#:~:text=Laminectomy%20is%20surgery%20that%20creates,the%20spinal%20cord%20or%20nerves (last visited Oct. 23, 2020).  Laminotomy is a surgery to remove a portion of the lamina "typically carving a hole just big enough to relieve the pressure in a particular spot."  See https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/multimedia/img-20149227 (last visited Nov. 10, 2020).  "Foraminotomy is a surgical procedure [which] enlarges the area around one of the bones in your spinal column.  The surgery relieves pressure on compressed nerves."  See https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/foraminotomy#:~:text=A%20foraminotomy%20is%20a%20surgical,relieves%20pressure%20on%20compressed%20nerves (last visited Oct. 23, 2020).

after surgery.  Id.  There are no additional records from Dr. Hill or St. Joseph's Neurosurgery Group.

Plaintiff resumed physical therapy on December 28, 2016.  Tr. at 600.  At his eighth session on February 2, 2017, Plaintiff expressed frustration with his lack of progress and was experiencing sharper pains in the right leg and numbness in the left leg. Id. at 629.

As previously noted, Dr. High was Plaintiff's primary physician, and he followed Plaintiff from March 2014 through mid-2019.  Tr. at 455-73, 630-39, 640-67, 688-790. In July 2014, Dr. High noted a positive straight-leg raise test, and prescribed strengthening exercises, Norco, and ibuprofen for Plaintiff's back pain radiating to his left leg, Flexeril for muscle spasms, Ambien for sleep, and Ativan for anxiety.[9]  Id. at 466, 468.  Dr. High continued to see Plaintiff about every other month, continuing prescriptions with slight changes such as adding Restoril for sleep.[10]  E.g., id. at 496 (5/16/15).  The doctor also treated Plaintiff for mild intermittent asthmatic bronchitis and acute exacerbations with albuterol (inhaler and nebulizer), Allegra, mometasone, and

---

[9]Ambien (generic zolpidem) is a sedative used to treat insomnia.  See https://www.drugs.com/ambien.html (last visited Oct. 23, 2020).  Ativan (generic lorazepam) is a benzodiazepine used to treat anxiety.  See https://www.drugs.com/ativan.html (last visited Oct. 23, 2020).

[10]Restoril is a benzodiazepine used to treat insomnia.  See https://www.drugs.com/search.php?searchterm=restoril&sources%5B%5D= (last visited Oct. 23, 2020).

azithromycin.[11]  Id. at 510, 518, 537.  Dr. High's treatment notes also reflect increased

radiating pain in Plaintiff's right leg after the November 2016 surgery.  Id. at 548.

After the surgery and physical therapy, Dr. High recommended a TENS unit to

reduce Plaintiff's pain.  Tr. at 630.  He also referred Plaintiff to Martin Cheatle, Ph.D.,

for behavioral medicine/pain management, id. at 639, although the record does not

contain any treatment notes from Dr. Cheatle.  Dr. High added Zanaflex to Plaintiff's

regimen for muscle spasms in April 2017.[12]  Id. at 647.  In January 2018, Dr. High also

diagnosed Plaintiff with depression and prescribed Effexor pending an evaluation by a

mental health professional.  Id. at 662.[13]  In August 2018, Plaintiff complained of pain in

his left foot and was prescribed Naproxen.[14]  Id. at 713.  In October 2018, Dr. High

prescribed Narcan "for any inadvertent overdose" on his prescribed opiate medications.[15]

---

[11]Albuterol is a bronchodilator used to treat or prevent bronchospasm in asthmatics.  See https://www.drugs.com/albuterol.html (last visited Oct. 23, 2020). Allegra is an antihistamine used to treat the symptoms of seasonal allergies.  See https://www.drugs.com/allegra.html (last visited Oct. 23, 2020).  Mometasone is a steroid used to prevent inflammation.  See https://www.drugs.com/mtm/mometasone-topical.html (last visited Oct. 23, 2020).  Azithromycin is an antibiotic.  See https://www.drugs.com/azithromycin.html (last visited Oct. 23, 2020).

[12]Zanaflex is a short-acting muscle relaxer.  See https://www.drugs.com/zanaflex.html (last visited Oct. 23, 2020).

[13]Effexor is an antidepressant.  See https://www.drugs.com/effexor.html (last visited Oct. 23, 2020).  At the time of his office visit in March 2018, Dr. High noted that Plaintiff had not filled the Effexor prescription and felt stable.  Tr. at 723.

[14]Naproxen is a nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/naproxen.html (last visited Oct. 23, 2020).

[15]Narcan contains naloxone hydrochloride, which blocks or reduces the effects of opioid medications, and is used to treat opioid overdose.  See https://www.drugs.com/narcan.html (last visited Oct. 23, 2020).

Id. at 714.  In December 2018, Plaintiff began complaining of numbness in his left arm. Id. at 707.[16]

Dr. High provided two Medical Source Statements.  The first was completed on December 23, 2016, a month after Plaintiff's surgery.  Tr. at 451-54.  At that time, Dr. High opined that Plaintiff's spinal stenosis and asthma limited him to sitting and standing/walking for four hours each in an eight-hour day at fifteen-minute intervals, and noted that Plaintiff would be required to take unscheduled breaks every hour for ten minutes.  Id. at 452.  The doctor found that Plaintiff could occasionally lift and carry ten pounds and rarely could lift twenty, id. at 453, and that Plaintiff was incapable of even low stress work.  Id. at 454.

In the latter Medical Source Statement, dated March 10, 2018, the doctor opined that Plaintiff could sit up to two hours and stand/walk for one hour in an eight-hour day, with the opportunity to alternate between sitting and standing every fifteen minutes.  Tr. at 680.  With prolonged sitting, Plaintiff would need to elevate his legs.  Id. at 685.  He found that Plaintiff could rarely lift and carry ten pounds, rarely use his upper extremities or lower extremities for pushing and/or pulling, id. at 680, and could rarely perform the postural activities of twisting, stooping, crouching, and climbing ladders or stairs.  Id. at

---

[16]The record also contains 100 pages identified as Emergency Department Records from Reading Hospital and Medical Center.  Index, B19F.  These records include routine x-rays and MRIs ordered by Dr. High and performed at Reading Hospital.  In addition, Plaintiff was seen twice in the Emergency Department.  The first involved a claim by his wife that he was suicidal on September 15, 2017, and he was evaluated and released.  Tr. at 823.  The second involved an assault in which he sustained contusions and abrasions to his back, rib area, and calf, and he was again evaluated and released.  Id. at 860.

686.  He also noted that Plaintiff's pain would frequently interfere with his focus and concentration and that he would require unscheduled breaks and walking breaks every fifteen to thirty minutes for five to ten minutes.  Id. at 681.  Again, the doctor noted that Plaintiff was incapable of even low stress jobs.  Id. at 683.

The record also contains an April 2015 independent medical evaluation by John F. Perry, M.D., regarding Plaintiff's July 24, 2014 work incident.  Tr. at 319.  Dr. Perry concluded that Plaintiff "may have had a sprain or strain or an exacerbation of his preexisting lumbar disc disease, but does not have a demonstrable aggravation of that condition," and found that Plaintiff could return to work without any restrictions at that point.  Id.

As mentioned at the outset of the recitation of medical evidence, Dr. Amundson conducted a consultative examination on September 16, 2015, diagnosing Plaintiff with degenerative disc disease with spinal stenosis, lumbar arthritis, and herniation, lumbar radiculopathy with sciatic pain, numbness, and a positive straight-leg raise test on the left, intermittent neck pain with a history of degenerative cervical joint disease, anxiety, and asthma.  Tr. at 364.  The doctor noted a limitation in Plaintiff's range of lumbar flexion and left hip rotation.  Id. at 373.  The doctor found that Plaintiff could continuously lift and carry up to ten pounds, frequently lift and carry twenty pounds, and occasionally lift and carry fifty pounds.  Id. at 365.  Dr. Amundson also opined that Plaintiff could walk and stand for two hours each in an eight-hour day in thirty minute intervals, and could sit for four hours in two-hour intervals.  Id. at 366.

Ziba Monfared, M.D., conducted a consultative examination on March 5, 2018, diagnosing Plaintiff with chronic back pain, status post surgery without radiculitis, and asthma. Tr. at 671. Dr. Monfared opined that Plaintiff could continuously lift and carry twenty pounds, frequently lift and carry fifty pounds, occasionally lift up to one-hundred pounds, sit for eight hours and sit and stand for seven hours in a work day in four-hour increments. Id. at 672-73.

At the initial consideration level, after reviewing Plaintiff's records, Josie Henderson, M.D., found on March 9, 2018, that Plaintiff could occasionally lift and carry twenty pounds, frequently lift ten pounds, and sit and stand/walk for six hours each in an eight-hour day. Tr. at 89-90. On March 12, 2018, Salvatore Cullari, Ph.D., concluded based on his record review that Plaintiff suffered from depressive/bipolar disorders and anxiety or obsessive- compulsive disorders, but based on his treatment history and essentially normal mental status exams, his mental health impairments were not severe. Id. at 88. The doctor found that Plaintiff had mild limitations in the abilities to understand, remember and apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. Id. at 87-88.

**D.    Consideration of Plaintiff's Claims**

1.    Alleged Disability Onset Date

Plaintiff first argues that the ALJ erred in determining that Plaintiff's alleged onset date was May 26, 2017, rather than July 24, 2014.  Doc. 12 at 12-14.  Some background is necessary to understand Plaintiff's argument.  Plaintiff's prior application was denied by an ALJ on June 1, 2017.[17]  The typed application for DIB (SG-SSA-16) dated November 17, 2017, indicates that Plaintiff became disabled from working on May 26, 2017.  Tr. at 188.  In another form entitled Application for Disability Insurance Benefits (SSA-16) dated October 6, 2017, and signed by Plaintiff, Plaintiff answered the question "When do you believe your condition(s) became severe enough to keep you from working . . . ?", by indicating October 7, 2015.  Id. at 183.  Confusing the issue further, in his Disability Report, Plaintiff reported that he stopped working on July 24, 2014, and gave as the reason, instead of his conditions, the fact that he had a prior claim for disability benefits denied by an ALJ on October 6, 2015.  Id. at 221.  When asked when his condition became severe enough to keep him from working, Plaintiff responded October 7, 2015.  Id.  The Field Office Disability Report indicates that the alleged onset date is May 26, 2017.  Id. at 232.  Finally, at the hearing, there was some discussion about the onset date:

> ALJ:  Counsel, I did see that there's an alleged onset date of
> May 26 of '17 and there's a prior unfavorable decision, dated

---

[17]According to the history of prior filings set forth in the initial disability determination, the prior ALJ decision was dated May 26, 2017.  Tr. at 83.  In their briefs, Plaintiff and Defendant agree that the prior ALJ decision denying benefits was dated June 1, 2017.  Doc. 12 at 13; Doc. 15 at 6.

> June 1st of 2017.  Did you talk to your . . . client about
> amending the onset date?
>
> ATTY:  I have and I haven't.  . . .  I talked to him about . . .
> how far it would go back, but I haven't talked to him about
> formally amending the onset date.
>
> ALJ:  All right.  Please have that conversation with him --
>
> ATTY:  Okay.
>
> ALJ:  -- and if appropriate, go ahead and submit a letter after
> the hearing.

Tr. at 35.  Again, at the end of the hearing, the ALJ reminded counsel about the issue.

> ALJ:  All right.  Counselor, if you want to send in the letter, if
> you could get that in by close of business tomorrow.

Id. at 55-56.  No letter was ever received, which the ALJ noted in finding no grounds for

reopening the prior decision.  Id. at 14.

Although presented as an issue regarding Plaintiff's alleged disability onset date,

the legal issue is whether res judicata applies to the period before the June 1, 2017 ALJ

decision on the prior application, and the related question whether the ALJ effectively

reopened that prior matter.  Plaintiff urges that "[a] 2017 [onset] date is not warranted by

the existence of a prior adjudication and res judicata," Doc. 12 at 13, challenging the

ALJ's determination that there were "no grounds for reopening the prior decision."  Tr. at

14.  Defendant argues that the ALJ correctly did not reopen Plaintiff's prior claim.  Doc.

15 at 4-6.

When a claimant files successive applications, the Administration may invoke res

judicata to avoid relitigation of issues the Administration has previously decided.  20

C.F.R. §§ 404.957(c)(1), 416.1457(c)(1).  Administrative res judicata has been

recognized and upheld by the Third Circuit.  See Domozik v. Cohen, 413 F.2d 5, 7 (3d

Cir. 1969); see also United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422

(1966) ("When an administrative agency is acting in a judicial capacity and resolves

disputed issues of fact properly before it which the parties have had an adequate

opportunity to litigate, the courts have not hesitated to apply res judicata to enforce

repose.").  An ALJ may reopen a previously adjudicated application in certain

circumstances.  See 20 C.F.R. §§ 404.988, 404.989, 416.1488, 416.1489.  The propriety

of the ALJ's decision to reopen or decline to reopen a prior claim is beyond judicial

review.  "It is well settled that federal courts lack jurisdiction under § 205 [of the Social

Security Act] to review the Commissioner's discretionary decision to decline to reopen a

prior application or to deny a subsequent application on *res judicata* grounds."  Tobak v.

Apfel, 195 F.3d 183, 187 (3d Cir. 1999) (citing Califano v. Sanders, 430 U.S. 99, 107-09

(1977); Stauffer v. Califano, 693 F.2d 306, 307 (3d Cir. 1982)).  "[B]ecause an

administrative decision declining to reopen a prior claim or denying a subsequent claim

on *res judicata* grounds does not require a hearing, it is not a 'final decision . . . made

after a hearing' as required for jurisdiction under § 205(d)."  Tobak, 195 F.3d at 187

(citing Sanders at 107-08); see also 20 C.F.R. §§ 404.903(l), 416.1403(a)(5)

(administrative actions not subject to judicial review include denial of a request to reopen

a determination).[18]  Here, the ALJ found "no grounds for re-opening the prior decision," tr. at 14, and this court has no jurisdiction to revisit that determination.[19]

Despite a lack of jurisdiction to review the propriety of an ALJ's reopening determination, the federal courts do have the authority to determine whether a reopening has occurred.  Coup v. Heckler, 834 F.2d 313, 317 (3d Cir. 1987), abrogated on other grounds by Gisbrecht v. Barnhart, 535 U.S. 789 (2002).  Plaintiff argues that the ALJ reopened the prior claim by reviewing "at least some of the records from the prior time period."  Doc. 12 at 134 (citing Lewis v. Apfel, 236 F.3d 503, 510 (9th Cir. 2001)).  In the Third Circuit, a de facto reopening will be found "where the administrative process does not address an earlier decision, but instead reviews the entire record in the new proceeding and reaches a decision on the merits."  Kaszer v. Massanari, 40 F. App'x 686, 692 (3d Cir. 2002) (quoting Kane v. Heckler, 776 F.2d 1130, 1132 (3d Cir. 1985)).  "In cases where an ALJ explicitly states that he is giving preclusive effect to a prior decision, there is little argument to be made that the case has been reopened."  Dowd v. Comm'r of Soc. Sec., 2009 WL 2246153, at *3 (W.D. Pa. July 26, 2009) (citing Kaszer, 40 F. App'x at 692).

---

[18]Here, although there was an administrative hearing, the topic of that hearing was not the reopening of the prior claim.  Rather, it was to determine whether Plaintiff became disabled after the prior ALJ decision.  The only discussion of reopening is contained in the above quoted excerpt, and counsel provided no subsequent justification for reopening.  Doc. 15 at 5-6.

[19]Although courts may have jurisdiction to "entertain constitutional questions, which are 'unsuited to resolution in the administrative procedures,'" Tobak, at 187 (quoting Sanders, 430 U.S. at 109), Plaintiff has not framed his claim as one of constitutional dimension.

In Kaszer, the Third Circuit interpreted its prior decision in Coup to require a two-step inquiry in determining if a de facto reopening had occurred.  First, the court must determine if the ALJ "address[ed] whether the prior adjudication [would] be used for its preclusive effect or whether it [would] be reopened."  40 F. App'x at 693-94.  Then, the court must determine whether the ALJ "reviewe[ed] the entire record in the new proceeding and reache[d] a decision on the merits."  Id. at 694 (quoting Coup, 834 F.2d at 317).[20]

As previously noted, the ALJ specifically found "no grounds for reopening the prior decision."  Tr. at 14.  Thus, the first step in the Coup test does not support a finding that there was a de facto reopening.

As for the second step, the Third Circuit has recognized the "fine line between considering a claimant's medical history solely for the purpose of establishing whether the claimant was disabled and actually reconsidering that evidence."  Kaszer, 40 F. App'x at 694.  Here, the ALJ reviewed Plaintiff's medical history, including his work injury, medical test results, and Plaintiff's surgery, all of which were relevant to the earlier decision.  Tr. at 20-21.  However, when turning to the opinion evidence, the ALJ reviewed only the opinions relevant to the period after the first ALJ decision, id. at 22-23,

---

[20]It is unclear from the Kaszer opinion whether the court should proceed to the second step if the first establishes that the ALJ specifically addressed the issue of reopening.  Because the court determined in Kaszer that the ALJ had not addressed the issue of reopening, it proceeded to the second step.  40 F. App'x at 694 ("No such expression [of reopening or the res judicata effect] was made here, so we move on to the second part of the Coup test.").  Here, I find that consideration of each of the Coup steps disfavors a finding that the prior claim was reopened.

illustrating that the ALJ drew a line between the evidence relevant to the prior
adjudication and that relevant to the period she was considering.  Thus, the ALJ
recognized the preclusive effect the prior decision had and considered the evidence
accordingly.

In fact, Plaintiff's own argument undermines his position that a de facto reopening
took place.  He complains that the ALJ failed to consider "important" evidence from the
earlier time period including positive straight-leg raising test results, Dr. High's 2016
RFC assessment, Dr. Close's 2016 opinion that the radiating pain was caused by a lesion
at L5-S1, and Dr. Amundson's 2015 opinion.  Doc. 12 at 14.  For a de facto reopening to
occur, the ALJ must have "review[ed] the entire record in the new proceeding and
reache[d] a decision on the merits."  Kaszer, 40 F. Appx. at 692 (quoting Kane, 776 F.2d
at 1132).  By Plaintiff's own argument and after carefully reviewing the ALJ's decision
and the record, I conclude that the ALJ did not address the entire record.  There was no
de facto opening of the prior decision, and the relevant period under consideration began
on June 1, 2017, the date of the prior ALJ determination.

2.    Consideration of Source Statements

Plaintiff next complains that the ALJ omitted reference to certain opinion
evidence, including Dr. High's 2016 Medical Source Statement and the opinions of Drs.
Amundson and Close.  Doc. 12 at 15-17.  Defendant responds that the ALJ properly did
not consider the Medical Source Statements relevant to the earlier adjudication as the
opinions were not relevant to the period currently under consideration.  Doc. 15 at 8.
Moreover, Defendant argues that the ALJ properly considered the opinion evidence

relevant to the current claimed disability period, utilizing the regulations applicable to claims filed on or after March 27, 2017.  Id. at 8-15.

The first part of Plaintiff's argument, regarding the assessments predating the relevant period under consideration, is intertwined with his first claim.  Having found that there was not a de facto reopening, res judicata applies to the period covered by the prior ALJ decision and the relevant period for purposes of this appeal began on June 1, 2017. The various opinions on Plaintiff's abilities prior June 1, 2017, are not relevant to consideration of his abilities after that date, particularly in light of Plaintiff's treatment history.  Dr. Amundson's opinion predated the relevant period by nearly two years, tr. at 361-73, and Dr. Close's opinion predated the relevant period by nine and one-half months.  Id. at 380-81.  Both opinions predate Plaintiff's November 2016 laminotomy. In addition, Dr. High completed his first Medical Source Statement the month following the laminotomy.  Id. at 451-54.  Thus, these records are outdated in time, especially considering the timing of Plaintiff's back surgery.

Plaintiff also complains that the ALJ's rejection of the opinions stated in Dr. High's 2018 Medical Source Statement is "erroneous" and demonstrates speculation. Doc. 12 at 16.  Defendant responds that the ALJ properly considered Dr. High's opinions using the revised regulations applicable to applications filed after March 27, 2017.  Doc. 15 at 8-14.

The new regulations abandon the concept of evidentiary weight and focus instead on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or

> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The regulations list the factors to be utilized in

considering medical opinions:  supportability, consistency, relationship including the

length and purpose of the treatment relationship and frequency of examinations,

specialization, and other factors including familiarity with other evidence in the record or

an understanding of the disability program.  Id. §§ 404.1520c(c), 416.920c(c).  The most

important of these factors are supportability and consistency, and the regulations require

the ALJ to explain these factors, but do not require discussion of the others.  Id.

§§ 404.1520c(b)(2), 416.920c(b)(2).  The regulations explain that "[t]he more relevant

the medical evidence and supporting explanations presented by a medical source are to

support his or her medical opinion . . . , the more persuasive the medical opinion . . . ."

Id. §§ 404.1520c(c)(1), 416.920c(c)(1).  In addition, "[t]he more consistent a medical

opinion . . . is with the evidence from other medical sources and nonmedical sources . . . ,

the more persuasive the medical opinion . . . will be."  Id. §§ 404.1520c(c)(2),

416.920c(c)(2).[21]

Here, after reviewing the opinions expressed in Dr. High's 2018 assessment, see

supra at 11-12, the ALJ found the opinion "partially persuasive because [Dr. High] has

treated [Plaintiff]; however, this treatment has noted largely unremarkable physical

---

[21]Plaintiff argues that the ALJ assigned only "partial weight" to Dr. High's
opinions.  Doc. 12 at 16.  As noted above, the concept of evidentiary weight is no longer
the standard.  Instead, the ALJ noted that Dr. High's 2018 opinion was "partially
persuasive," utilizing the revised regulations.  Tr. at 23.

examination findings and conservative treatment throughout [the] period in question."
Tr. at 23 (citing id. at 688-790).  Plaintiff argues that it is unclear whether the ALJ is
referring to Dr. High's treatment or Plaintiff's treatment in general.  Doc. 12 at 16.
Considering that the ALJ cited to Dr. High's treatment notes from June 2017 to May
2019, and stated his conclusions based on "this treatment," I conclude that the ALJ
determined that the opinions expressed in the 2018 statement were not supported by Dr.
High's own treatment notes during the relevant period.

Moreover, the treatment records from Dr. High for the relevant period support the
ALJ's determination.  Although the doctor noted complaints of back pain, radiating into
Plaintiff's left leg at times, and intermittent spasms, Plaintiff's range of motion was
consistently normal, his treatment remained unchanged, and he failed to follow up on
referrals to a behavioral/pain specialist.  See tr. at 693-94, 700[22]  (2/11/19 - despite claims
of back pain, normal musculoskeletal exam and EMG studies regarding numbness in his
left arm and hand were normal); 698, 707 (12/27/18 – complaints of back pain, normal
range of motion, complaints of left arm and hand numbness); 705-06 (10/8/18 -
complaints of back pain, normal range of motion, exhibits pain in lumbar spine, referral
to Dr. Cheatle for "Behavioral Med/Pain"); 708-11 (8/14/18 – left foot pain, back pain,
normal range of motion with tenderness in left foot), 715-21 (6/13/18 – normal range of
motion with lumbar back pain, referral to Dr. Cheatle for pain management); 723-28
(3/12/18 – back pain radiating to leg, musculoskeletal exam reveals lumbar back pain);

_____

[22]Some of the pages of treatment notes are separated from others for the same date.

730-36 (1/15/18 – normal range of motion, exhibits lumbar back pain); 737-41, 750

(9/26/17 – noted muscle spasm); 745-49 (6/21/17 – TENS unit not helpful, missed

appointment with Dr. Cheatle, not to reschedule, using less of muscle relaxant).

     Plaintiff also argues that the treatment that the ALJ characterized as

"conservative" included back surgery, physical therapy, the use of a TENS unit and

narcotic medications.  Doc. 12 at 16.  This argument is again related to the previously-

addressed issue of res judicata.  Plaintiff underwent back surgery prior to the period

under review.  The records indicate that Plaintiff attended physical therapy and

underwent spinal injections prior to the relevant period.  Plaintiff also argues that his use

of narcotic medications is inconsistent with conservative treatment, but offers no caselaw

in support of this contention and the cases from this circuit have rejected similar

arguments.  See Porcelli v. Colvin, Civ. No. 14-1156, 2015 WL 5693431, at *14 (M.D.

Pa. Sept. 28, 2015) (quoting Purnell v. Astrue, 662 F. Supp.2d 402, 410 (E.D. Pa. 2009)

(Kelly, J.) ("the use of commonly prescribed pain medication, even a narcotic, does not

remove [plaintiff's] treatment from the realm of conservative treatment")); Gunder v.

Astrue, Civ. No. 11-300, 2012 WL 511936, at *12 (M.D. Pa. Feb. 15, 2012) (describing

treatment including use of narcotic pain treatment as conservative).  In addition, although

Plaintiff continued on narcotic medications for treatment of his back and radiating pain,

he did not follow up with the behavioral/pain specialist as recommended by Dr. High,

and Dr. High noted that Plaintiff's decrease in the use of muscle relaxants indicated that

Plaintiff need not reschedule.  Tr. at 745.  The ALJ's consideration of Dr. High's 2018

opinions is consistent with the new governing regulations and supported by substantial evidence.[23]

### 3.   Consideration of Medication Side Effects and Plaintiff's Limitations in Concentration

Plaintiff's next two claims are related.  He claims that the ALJ failed to give adequate consideration to his medication regimen, specifically to the side effects of his long-term opiate treatment, and failed to consider his limitations in concentration, persistence, or pace.  Doc. 12 at 17-21.  Defendant responds that the ALJ adequately considered Plaintiff's complaints of side effects of his medication, including Plaintiff's complaints of problems with concentration.  Doc. 15 at 15-17.

Although the ALJ did not specifically equate Plaintiff's sleep and concentration problems with his medication, she noted Plaintiff's use of Vicodin or Percocet for pain, and Ambien and Restoril for sleep, and his complaints of problems with concentration.  Tr. at 20, 21.  The ALJ also noted that state agency psychological consultant Dr. Cullari found from his record review that Plaintiff had a mild limitation in concentrating, persisting or maintaining pace.  Id. at 17.

Contrary to Plaintiff's argument, the ALJ recognized that he had problems with concentration, and found, consistent with Dr. Cullari's conclusion, that Plaintiff had a mild limitation in the area of concentration, persistence, and maintaining pace.  Tr. at 18.

---

[23]In Defendant's response, he also reviewed the ALJ's analysis of the assessments of consultative examiner Dr. Monfared and state agency physician Dr. Henderson.  Doc. 15 at 13-14.  Because Plaintiff limited his challenge to the ALJ's consideration of reports pre-dating the relevant period and Dr. High's 2018 assessment, Doc. 12 at 15-16, I have limited my discussion to those assessments.

To account for this limitation, the ALJ limited Plaintiff to unskilled work.  Id. at 19.

Plaintiff cites to the Third Circuit's decision in Ramirez v. Barnhart, 372 F.3d 546 (3d

Cir. 2004), in arguing that the ALJ's limitation to unskilled work is insufficient to

account for the mild limitation in concentration.  Doc. 12 at 20-21.  In 2019, the Third

Circuit revisited Ramirez and determined that a limitation to "simple tasks" is sufficient

to convey a *moderate* limitation in concentration, persistence and pace.  Hess v. Comm'r

of Soc. Sec., 931 F.3d 198 (3d Cir. 2019); see also Weaver v. Saul, Civ. No. 18-3295,

2019 WL 4220927, at *1 n.1 (E.D. Pa. Sept. 5, 2019) (Robreno, J.) (applying Hess to

conclude a limitation to unskilled work was sufficient to account for a *moderate*

limitation in concentration, persistence and pace).[24]  As mild limitation is obviously less

limiting than moderate limitation, the restriction to unskilled work was adequate to

address this limitation.

Moreover, the governing regulations state that when the limitations imposed by a

mental impairment are rated as none or mild, "we will generally conclude that your

impairment(s) is not severe, unless the evidence otherwise indicates that there is more

than a minimal limitation in your ability to do basic work activities."  20 C.F.R.

§§ 404.1520a(d)(1), 416.920a(d)(1).  Thus, the ALJ's limitation to unskilled work was

more than necessary to account for a mild limitation in concentration, persistence, and

pace.

---

[24]Unskilled work is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. §§ 404.1568(a), 416.968(a).

In sum, I find that the ALJ's limitation to unskilled work was sufficient to convey a *mild* limitation in concentration, persistence, and pace.  Contrary to Plaintiff's argument, the ALJ acknowledged Plaintiff's limitations in concentration and issues with sleep, but also accounted for them in the RFC determination.  I find no error.

4. Subjective Complaints

Finally, Plaintiff complains that the "ALJ failed to adequately discredit [his] subjective complaints."  Doc. 12 at 22.  Defendant responds that the ALJ properly considered Plaintiff's subjective complaints.  Doc. 15 at 17-19.

At the administrative hearing, Plaintiff testified that he has good days, when he can do some chores around the house.  Tr. at 38-39.  However, when he has bad days, which he estimated to be six days a month, he suffers from "a crippling kind of pain" and needs help getting out of bed, off the couch, and getting dressed.  Id. at 38-39, 45.  Plaintiff describes constant pain in his lower back and left leg, even on good days.  Id. at 43.  Plaintiff estimated that he could sit for half an hour before needing to get up, walk for ten to fifteen minutes before needing to sit down, and said that his symptoms were exacerbated when he does anything for an extended period of time.  Id. at 38-39, 45-46.  In addition, Plaintiff testified that he has difficulty concentrating, and suffers from shortness of breath when he climbs stairs.  Id. at 46-47.

Social Security regulations require a two-step evaluation of subjective symptoms: (1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and (2) an evaluation of the intensity and persistence of the pain or symptoms and the extent

to which it affects the individual's ability to work.  20 C.F.R. §§ 404.1529(b), 416.929(b). In considering the intensity and persistence of such symptoms, the ALJ is required to consider, among other things, one's daily activities, the location, duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, the type, dosage, effectiveness, and side effects of medications taken to alleviate the symptoms, treatment other than medication, and measures used to relieve the pain.  Id. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); S.S.R. 16-3p, "Titles II and XVI:  Evaluation of Symptoms in Disability Cases," 2016 WL 1119020, at *7 (March 16, 2016).

Here, the ALJ reviewed the relevant medical evidence, noting the medications and modalities Plaintiff used to treat his conditions.  Tr. at 20-24.  The ALJ also noted Plaintiff's activities in support of the RFC assessment, including Plaintiff's reports that he can do chores around the house on good days, drives, and occasionally goes out shooting.  Id. at 20.  Ultimately, the ALJ determined that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Id. However, rather than rejecting Plaintiff's testimony, the ALJ credited Plaintiff's testimony to the extent she limited him to unskilled, sedentary work with the ability to alternate from standing to sitting every thirty minutes, with limits on his ability to reach and lift overhead, and postural and environmental limitations.  Id. at 19.

Plaintiff also contends that the ALJ discredited Plaintiff's complaints based on her own medical judgment.  Doc. 12 at 22.  This argument overlooks the ALJ's consideration of the medical evidence.  As previously discussed, see supra at 21-23, I find that the ALJ

properly considered Dr. High's 2018 assessment and found it only partially persuasive

because it was inconsistent with the doctor's contemporaneous treatment notes for the

relevant period which "noted largely unremarkable physical findings and conservative

treatment." <u>Tr.</u> at 23.  Moreover, the ALJ's RFC determination is supported by the

reports by consultative examiner Dr. Monfared, <u>see id.</u> at 672-77, and Dr. Henderson's

assessment based on her records review.  <u>Id.</u> at 89-91.[25]  Thus, contrary to Plaintiff's

contention, the ALJ's RFC was based on the record, not the ALJ's lay opinion.

## IV.   <u>CONCLUSION</u>

The ALJ did not reopen Plaintiff's prior claim for benefits.  Thus, the relevant

period under review began on June 1, 2017.  The ALJ's decision is supported by

substantial evidence and she properly considered the relevant opinion evidence, the

effects of Plaintiff's medication and the mild limitations Plaintiff has in concentration,

persistence, and pace, and Plaintiff's subjective complaints.

An appropriate Order follows.

---

[25]The ALJ found Dr. Monfared's assessment partially persuasive, noting that "there are additional limitations based on [Plaintiff's] complaints of pain and the medical records indicating continued treatment" for which Dr. Monfared had not accounted.  <u>Tr.</u> at 23.  Likewise, the ALJ found Dr. Henderson's assessment partially persuasive, noting that the medical records supported a limitation that Plaintiff can only occasionally rather than frequently climb ramps and stairs.  <u>Id.</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW HEISEY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  20-324 |
| Social Security | : | |

## O R D E R

AND NOW, this 23rd day of November, 2020, upon consideration of Plaintiff's

request for review (Doc. 12), the response (Doc. 15), and after careful consideration of

the administrative record (Doc. 11), IT IS HEREBY ORDERED that:

1.   Judgment is entered affirming the decision of the Commissioner of Social
Security and the relief sought by Plaintiff is DENIED, and

2.   The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.